MURPHY, Circuit Judge,
concurring in part and concurring in the judgment.
I respectfully disagree with Judge Lo-ken’s extraterritoriality analysis. The challenged provisions in the Next Generation Energy Act would regulate entities outside Minnesota only if those entities “import” electric power into Minnesota or enter into power purchase agreements that result in power being imported into Minnesota. These provisions would not regulate commerce “that takes place wholly outside of [Minnesota’s] borders.” For these reasons I disagree with Judge Loken’s conclusion that the provisions have an unconstitutional extraterritorial effect. See Healy v. Beer Inst., 491 U.S. 324, 336-37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).
The district court’s injunction should nonetheless be affirmed because both of the challenged statutory provisions are preempted by the Federal Power Act. That act gives the Federal Energy Regulatory Commission exclusive jurisdiction to regulate wholesale sales and the transmission of electric energy in interstate commerce. See New York v. FERC, 535 U.S. 1, 6-7, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002).
I.
The Constitution gives Congress the power “[t]o regulate Commerce among the several States.” U.S. Const. Art. I, § 8, cl. 3. That power also has a “negative or dormant implication,” which “prohibits state taxation or regulation that discriminates or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace.” Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (citations omitted). Under the dormant Commerce Clause, a statute faces strict scrutiny and is almost always invalid if it “discriminates against interstate commerce.” Dept. of Revenue of Ky. v. Davis, 553 U.S. 328, 338, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008). If the law is nondis-eriminatory and “regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). One line of Supreme Court cases has invalidated statutes which have an impermissible extraterritorial effect by “controlling commercial activity occurring wholly outside the boundary of the State.” Healy, 491 U.S. at 337, 109 S.Ct. 2491. The critical inquiry in these cases “is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.” Id. at 336, 109 S.Ct. 2491.
The Minnesota statute at issue before us provides that “no person shall:”
*924 (1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;
(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or
(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.
Minn. Stat. § 216H.03, subd. 3. The phrase “statewide power sector carbon dioxide emissions” is defined as the total carbon dioxide emissions “from the generation of electricity within the state” and “from the generation of electricity imported from outside the state and consumed in Minnesota.” Id. subd. 2.
The two challenged statutory provisions apply to companies which are engaged in commerce which enters into Minnesota. Clause (2) applies to entities that “import” power “from outside the state.” Id. subd. 3. The power purchase agreement provision in clause (3) applies to entities which enter into agreements that increase Minnesota’s carbon emissions from electricity generation in Minnesota or from generation of electricity “imported from outside the state and consumed in Minnesota.” See id. subds. 2-3. These provisions do not allow Minnesota to regulate transactions that occur “wholly outside” the state.
Judge Loken relies on incorrect assumptions to conclude that the statute operates extraterritorially because it applies to all events occurring anywhere on the MISO grid (Midcontinent Independent System Operator). In his view the statute regulates flows of electrons because a generating facility outside Minnesota which “injects electricity into the MISO grid ... cannot ensure that those electrons will not flow into and be consumed in Minnesota.” Experts have pointed out, however, that electrons do not behave like drops of water flowing through a pipe, for this “is not how electricity works.” Brief of Electrical Engineers et al. as Amici Curiae Supporting Respondents, New York v. FERC (No. 00-568), 2001 WL 605124 at *6 (“Brief of Electrical Engineers”), cited in New York, 535 U.S. at 7 n. 5, 122 S.Ct. 1012. “Water pipe metaphors for the transmission of electricity are popular, but misleading.” Id. (citation omitted).
In the electricity transmission system, individual electrons do not actually “flow” in the same sense as water in a pipe. Id. at *6-7. Rather, the electrons oscillate in place, and it is electric energy which is transmitted through the propagation of an electromagnetic wave. Id. Electricity on the grid behaves according to the laws of physics, and it cannot be dispatched from one particular place to another. Id. at *8-9. “Energy flowing onto a power grid energizes the entire grid, and consumers then draw undifferentiated energy from that grid.” Id. at *9.
How the grid actually works is important because in interpreting a Minnesota statute we presume that the legislature did “not intend a result that is absurd, impossible of execution, or unreasonable.” Minn. Stat. § 645.17(1). For example, if a coal power plant in Arkansas were to bid its generation into the MISO market and be requested by MISO to generate power, that coal plant would not inject electrons into the grid to “flow into and be consumed in Minnesota” as suggested by Judge Loken, even though Minnesota utilities were simultaneously drawing power from the grid. The actual flows of power are unpredictable, uncontrollable, and untraceable. Brief of Electrical Engineers at *2, 15-16. Because the energized grid behaves as an undifferentiated electromagnetic wave, and there is no way to trace *925 the flows of electric power on the grid from generators to local distribution substations. Thus, it would be impossible for the Minnesota Attorney General to enforce the statute as Judge Loken envisions. See id. The State concedes as much in its brief where it states that it “could not enforce” the import provision against transactions in the MISO short term energy markets. Interpreting the import provision to apply to all new power plants in MISO (or elsewhere as appellees contend) is therefore not reasonable.
A sounder reading of the text is that the import provision in the statute applies to bilateral contracts in which a Minnesota utility agrees to purchase power from a new large energy facility out of state. The language in the statute supports this interpretation because it creates exemptions for certain “contracts]” entered into before 2007 “to purchase power from [an approved] new large energy facility” and for power purchase agreements “between a Minnesota utility and [an approved] new large energy facility located outside Minnesota.” Minn. Stat. § 216H.03, subd. 7(2) — (3). This interpretation avoids making the statute “impossible of execution.” See Minn. Stat. § 645.17(1).
To be sure, the statute is ambiguous as to exactly which actions would “import” power from outside the state. Our duty in such a situation is to adopt a reasonable construction of the statute which avoids the constitutional problems in the statutory interpretation by the appellants. See Union Pac. R.R. Co. v. U.S. Dep’t of Homeland Sec., 738 F.3d 885, 892-93 (8th Cir. 2013). We presume the Minnesota legislature did not intend its statute to be interpreted in a manner which raises serious constitutional questions. See Clark v. Martinez, 543 U.S. 371, 381-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). We also presume that Minnesota laws do not apply extraterritorially. See Morrison v. Nat’l Australia Bank Ltd., 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010); In re Pratt, 219 Minn. 414, 18 N.W.2d 147, 153 (1945).
Judge Loken contends that the presumption against extraterritoriality does not apply here because the statute’s text clearly provides for extraterritorial applications. I disagree. Although the statute covers power plants outside Minnesota which enter into contracts with utilities within the state, that does not mean it controls commerce occurring wholly outside the state. A state may subject out of state companies to its laws when they enter into commerce within the state without violating any extraterritoriality principle. See, e.g., Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 669-70, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (rejecting extraterritoriality challenge to Maine’s prescription rebate program brought by out of state drug manufacturers).
In Cotto Waxo Co. v. Williams, 46 F.3d 790 (8th Cir. 1995), our court explained the distinction between wholly extraterritorial regulation and regulations which apply to out of state companies entering into commerce within a state. In Cotto Waxo, an out of state manufacturer was forced to stop selling its products in Minnesota after the latter’s legislature issued a ban on them. The company contended that the Minnesota law was invalid because it prevented “an out-of-state manufacturer from selling its product to out-of-state retailers and end users.” Id. at 793. We explained that Cotto Waxo had “misapprehend[ed] the meaning of extraterritorial reach,” which refers to statutes that “necessarily require[ ] out-of-state commerce to be conducted according to in-state terms.” Id. at 793-94. Although the Minnesota law “[c]learly ... affected Cotto Waxo’s participation in interstate commerce,” its effect was not unconstitutionally extraterritorial *926 because it was “indifferent to sales occurring out-of-state” and Cotto Waxo was “able to sell to out-of-state purchasers regardless of [its] relationship to Minnesota.” Id. at 794.
In this ease like in Cotto Waxo, the text of the import provision bars contracts between generators and utilities in Minnesota, but allows the generators to contract freely with utilities outside Minnesota. See 46 F.3d at 793-94. It therefore does not control conduct wholly outside Minnesota. See id. Compare Quik Payday, Inc. v. Stork, 549 F.3d 1302, 1308 (10th Cir. 2008) (rejecting extraterritoriality challenge to enforcement of Kansas’s payday lending law against internet lender based in Utah making loans to Kansans located in their home state), and State ex rel. Swanson v. Integrity Advance, LLC, 870 N.W.2d 90, 95-96 (Minn. 2015) (rejecting extraterritoriality challenge to Minnesota’s payday lending law by Delaware internet lender), with Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 669 (7th Cir. 2010) (invalidating Indiana lending law as applied to an Illinois company lending to Indiana residents using contracts which were made and executed entirely in Illinois).
The text of this Minnesota statute indicates that the import provision does not cover activity which occurs “wholly outside” the state, Healy, 491 U.S. at 336, 109 S.Ct. 2491, and the State reasonably construes this statute as having no application to transactions on the MISO market. I therefore respectfully disagree with Judge Loken’s conclusion that the' challenged provisions operate extraterritorially.
II.
This case can be resolved by a preemption analysis that avoids the complex issues surrounding an application of the extraterritoriality doctrine to the electricity markets, because both challenged statutory provisions are preempted by the Federal Power Act (FPA). See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring). The FPA gives exclusive jurisdiction to the Federal Energy Regulatory Commission (FERC) over “the transmission of electric energy in interstate commerce” and “the sale of electric energy at wholesale in interstate commerce.” New York, 535 U.S. at 6-7, 122 S.Ct. 1012; 16 U.S.C. § 824(b)(1). The act distinguishes between wholesale sales among electric power generators and utilities, which are regulated by FERC, and retail sales of electricity by load serving entities who purchase power at wholesale and resell it to end users. See FERC v. Electric Power Supply Ass’n (EPSA), 577 U.S.-, 136 S.Ct. 760, 767-68, 193 L.Ed.2d 661 (2016).
The import provision in the Minnesota statute covers transactions which “import or commit to import from outside the state power from a new large energy facility.” Minn. Stat. § 216H.03, subd. 3(2). Since the import provision bans contracts for power from new large power plants, it thus bans wholesale sales of electric energy in interstate commerce. The FPA “ ‘leaves no room either for direct state regulation of the prices of interstate wholesales’ or for regulation that ‘would indirectly achieve the same result.’ ” EPSA, 577 U.S. at -, 136 S.Ct. at 780 (quoting Northern Natural Gas Co. v. State Corp. Comm’n of Kan., 372 U.S. 84, 91, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963)). The FPA therefore preempts the import provision.
Appellants contend that the import provision in this statute is not preempted because it relates to a traditional area of state regulation not covered by the FPA. FERC has recognized that the states retain authority under the FPA to regulate in “traditional areas” such as the “administration of integrated resource planning and utility buy-side and demand-side decisions” and “utility generation and resource port *927 folios.” See New York, 535 U.S. at 24, 122 S.Ct. 1012 (quoting FERC Order 888). The import provision in this statute, however, does not fall into any of those categories. Unlike those state laws, the import provision here directly bans certain wholesale sales.
The transactions covered by the power purchase agreement provision (which are contracts for 50 megawatts or more of capacity) are wholesale transactions. See Minn. Stat. §216H.03, subd. 3(3).[7] These agreements cover capacity on the national electricity grid and are thus made “in interstate commerce.” See EPSA, 577 U.S. at -, 136 S.Ct. at 768; New York, 535 U.S. at 17, 122 S.Ct. 1012. FERC has jurisdiction to regulate certain parameters of the capacity market, and “the price of capacity is indisputably a matter within the Commission’s exclusive jurisdiction.” New England Power Generators Ass’n, Inc. v. FERC, 757 F.3d 283, 290 (D.C. Cir. 2014); cf. Hughes v. Talen Energy Mktg., LLC, 578 U.S. -, 136 S.Ct. 1288, 194 L.Ed.2d 414 (2016) (discussing FERC regulation of capacity markets). Minnesota’s ban on certain capacity contracts directly conflicts with. FERC’s jurisdiction. The power purchase agreement provision is thus also preempted by the FPA.
I agree with Judge Loken that we have jurisdiction and concur in the judgment, but I disagree with Judge Loken’s extraterritoriality analysis and would instead affirm the district court’s injunction because both of the challenged provisions are preempted by the FPA.

. In the electricity markets “capacity” is the ability to produce electric power when necessary. Utilities purchase capacity from electric power generators to ensure they can obtain enough power during peaks in electricity demand. See Conn. Dep’t of Pub. Util. Control v. FERC, 569 F.3d 477, 479 (D.C. Cir. 2009).