(Decided 5th December, 1890.)

JOHN ADAM TRAGESER *vs.* JOHN T. GRAY, Clerk of
the Court of Common Pleas.

*Sale of Intoxicating liquors—Police power—Constitutionality
of the Act of* 1890, *ch.* 343.

The Act of 1890, ch. 343, prescribing a new system for the regula-
tion of the sale of intoxicating liquors in the City of Baltimore
by the establishment of a Board of three Commissioners, invested
with the power of granting licenses to sell by retail only to
citizens of the United States of temperate habits and good moral
character, is a valid exercise of the police power of the State,
and is not repugnant to section one of the Fourteenth Amend-
ment to the Constitution of the United States, which provides
that, "No State shall make or enforce any law which shall
abridge the privileges or immunities of citizens of the United
States * * * nor deny to any person within its jurisdiction
the equal protection of the laws."

APPEAL AS UPON WRIT OF ERROR, from the Baltimore
City Court.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER,
BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

Trageser *vs.* Gray.

*Joseph S. Heuisler*, and *Frederick C. Cook*, for the appellant.

*William S. Bryan, Jr.*, for the appellee.

BRYAN, J., delivered the opinion of the Court.

The Act of 1890, chapter 343, prescribed a new system for the regulation of the sale of intoxicating liquors in the City of Baltimore. A Board was established, consisting of three commissioners, invested with the power of granting licenses to sell these liquors by retail. Every one applying for such license was obliged to file his petition with the Board, setting forth a number of statements tending to show that he was a fit person to be licensed. It was required to be verified by his own affidavit, and also to be sustained by a certificate of at least ten respectable persons, declaring that they were acquainted with the petitioner, and that they had good reason to believe that all the statements of the petition were true, and that they therefore prayed that the license should be issued to him. Provision was also made for giving extended notification of the petition, by advertisement in two newspapers of general circulation in the city; and also for the public hearing of this petition; and the petition of other persons in favor of granting the license; and also remonstrances against granting it. It was further provided that licenses to sell by retail should be granted only to citizens of the United States of temperate habits and good moral character. A number of other regulations were made, which it is not now necessary to state; but they all show extreme and anxious solicitude on the part of the Legislature to diminish the evils arising from the excessive use of ardent spirits. If the Commissioners should grant the license, the applicant was required to pay to the Clerk of the

Court of Common Pleas two hundred and fifty dollars; and thereupon it became the duty of the said clerk to issue it.

Trageser, a native of Prussia, and not a naturalized citizen of the United States, instituted this proceeding for the purpose of testing the validity of this law. He contends that the law is null and void, and that he has a right to obtain a license under the law, which was in force before this statute was passed. He accordingly applied to John T. Gray, the clerk of the Court of Common Pleas, for a license to sell spirituous liquors by retail; and offered to pay him the sum of fifty dollars, which was the license fee under the former law. The clerk refused to issue the license, and thereupon Trageser filed a petition in Baltimore City Court, for a writ of mandamus to compel the issue. After answer and demurrer thereto, the City Court dismissed his petition. The case is brought to this Court by petition in the nature of a writ of error, and the sole question presented is, whether the statute is a valid and constitutional enactment.

Under every system of government, there must be power in some of its departments to provide for the regulation of the internal affairs of the State. Public morals, public health, public order, peace and tranquility are objects of cardinal importance to the well-being of society. Without the power to protect and preserve these interests, civilized governments could not exist. The limits and extent of this power are somewhat vague and undefined. Private interests are frequently found in opposition to the public good, and cases may doubtless occur, in which it will be a matter of great difficulty and delicacy to settle with justice their conflicting pretensions. But it is not necessary to decide such questions until they arise. The merits of the present controversy will be ascertained by the applica-

Trageser *vs.* Gray.

tion of sound principles, under the guidance of authoritative adjudications.    The habit of drunkenness, and the evils attendant upon it, have always received a considerable degree of attention from the law-making power. And when we consider the poverty, misery, ruin and wretchedness which intoxication entails upon its unhappy victims; and the unspeakable woes which must be endured by helpless and innocent beings dependent upon them; and also the frequent crimes and disorders produced by the same cause, we may measure in some degree the necessity for a legislative remedy, if one can be found.    Every consideration connected with the public welfare imperatively demands it.    It is a duty which the Legislature cannot evade.    Their power over the whole subject under the Constitution of this State cannot at this day be questioned.    They may prohibit the sale of spirituous liquors entirely if they see fit to do so; or they may restrict it in any manner which their discretion may dictate.    No one can claim as a right the power to sell; either at any time, or at any place, or in any quantity.    If he is allowed to sell under any circumstances, it is simply by the free permission of the Legislature, and on such terms as it sees fit to impose.    In the law which we are now considering, the Legislature hedged around this traffic with such safeguards as were deemed advisable for the purpose of protecting the public interest.    It was an effort to restrict the licenses to such persons as would not abuse the privilege conferred; to this end the applicant was required to establish his fitness for the privilege by abundant testimony, and to promise, under oath, that he would not permit on his premises certain violations of the law, which have frequently been associated with the traffic, and which have caused great scandal, immorality and disorder.    And by section 653 J, it was enacted that the license should be refused in all cases, whenever, in the opinion of the

said Board, such license is not necessary for the accommodation of the public, or the petitioner or petitioners is or are not fit persons to whom such license should be granted; and if sufficient cause shall at any time be shown, or proof be made to the said Board, that the party licensed was guilty of any fraud in procuring such license, or has violated any law of the State relating to the sales of intoxicating liquor, the said Board shall, after giving notice to the person so licensed, revoke said license; and the Criminal Court of the city may in like manner revoke said license, if the party should be convicted before it, of any such violation.'' It was thought proper to confine the license to citizens of the United States, of temperate habits and good moral character. The privilege is very liable to be abused, and abuses would produce great public detriment. It therefore seemed wise to the Legislature to confer it only on those who, being natives of the country, might reasonably be supposed to have a regard for its welfare; or who, not being natives, had, as required by the naturalization law, proven by credible testimony before a Court of Justice, that they were attached to the principles of the Constitution of the United States, and were well disposed to their good order and happiness. It was certainly the function of the law-making department to exercise its judgment on this question, and this Court has no right to criticize its conclusion. We do not think that this law is, in any manner, in conflict with the Constitution of this State.

We regard it as included "in that immense mass of legislation which embraces everything within the territory of a State, not surrendered to the General Government." *Gibbons vs. Ogden,* 9 *Wheaton,* 203. It has been uniformly held in all Courts that no clause in the Federal Constitution interferes with the power of the States to promote and protect the public health, peace, morals

and good order within their respective limits. In *Kidd vs. Pearson*, 128 *United States*, 1, the Supreme Court decided that a State has the right to prohibit or restrict the manufacture of intoxicating liquors within its limits; to prohibit all sale and traffic in them, and to inflict penalties for such manufacture and sale. We quote a passage relating to the manufacture, and necessarily it is equally applicable to sales: "We have seen that whether a State, in the exercise of its undisputed power of local administration, can enact a statute prohibiting within its limits the manufacture of intoxicating liquors, except for certain purposes, is not any longer an open question before this Court." And it was further said that this power of local administration, usually called the police power, was as broad and plenary as the taxing power. It is, however, maintained by the appellant that although this statute was passed apparently for the purpose of exercising this power, yet it is in conflict with the Fourteenth Amendment, because it denies to persons not citizens of the United States the right to obtain licenses to retail liquor, and thereby makes an unconstitutional discrimination against them. The section of the amendment supposed to be involved is in these words: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It cannot be said that any man, alien or citizen, has a natural right to retail intoxicating liquor. According to *Bartemeyer vs. Iowa*, 18 *Wallace*, 129, it is not one of the privileges and immunities of citizens of the United States. In *Mugler vs. Kansas*, 123 *U. S.*, 623, it was said that "such a right did not inhere in citizenship," and that it could not be

said that government interfered with or impaired any one's constitutional rights of liberty or property, when it prohibited the manufacture and sale of intoxicating drinks. And it was held that this prohibition might be made although it would destroy or greatly diminish the value of manufactories, which had been erected when it was lawful to engage in such business. In *Kidd vs. Pearson*, 128 *U. S.*, 1, a statute of Iowa prohibited the manufacture or sale of intoxicating liquors except for mechanical, medicinal, culinary and sacramental purposes; but any citizen of the State was permitted to manufacture or buy and sell for these purposes, except hotel-keepers, keepers of saloons, eating houses, grocery keepers and confectioners. The Supreme Court decided that the statute did not in any way contravene any provision of the Fourteenth Amendment. We see that the privilege granted was confined to citizens of the State, and that there was a discrimination against five classes of these citizens. But in truth, the valid exercise of the police power does not depend on any question of discrimination for or against particular persons or classes of persons. It is confided to the wisdom of the Legislature to make such application of it as the public welfare may require. In the case of occupations which may become injurious to the community they may prohibit them altogether, or they may permit them only in certain localities and on certain terms and under certain restrictions, or they may grant the privilege of pursuing them to some persons and deny it to others. Individual interests are not all considered in the exercise of this power. They must yield when they are in opposition to the public good. And the Legislature is to determine what measures will best promote the public good in dealing with these matters. In *Mugler vs. Kansas* it was said that it was not to be supposed that the Fourteenth Amendment was intended to impose re-

straints on the exercise of the police power by the States. It was also said that a State could not by any contract limit its exercise of this power where the public health and the public morals would be prejudiced; and a case was cited with approval (*Stone vs. Mississippi*, 101 *U. S.*, 814,) where a charter to conduct a lottery had been granted to a private corporation for a large moneyed consideration, and was afterwards repealed, and the repeal was sustained as within the police power of the State. And in the same case the Court stated with great emphasis the necessity of upholding State police regulations which were enacted in good faith and which had appropriate and direct connection with that protection to life, health and property which each State owes to its citizens. And in this case, and subsequently in *Powell vs. Pennsylvania*, 127 *U. S.*, 684, it was shown that a statute enacted in good faith for the exercise of the police power could not be regarded as repugnant to the Fourteenth Amendment, unless it had no real or substantial relation to the objects of such power. In the *Slaughter House Cases*, (16 *Wallace*, 36,) it was held that in the exercise of the police power the State of Louisiana could lawfully grant to a single corporation, for twenty-five years, the exclusive privilege of maintaining slaughter houses in a district of country containing more than eleven hundred square miles, and including the City of New Orleans. The trade of a butcher, though of great utility and necessity, is liable under some circumstances to injure the public health, and was, therefore, subject to this sort of legislation.

There are cases, unquestionably, in which discriminations against particular persons or classes of persons would be unlawful. They are indicated in *Powell vs. Pennsylvania*, and in many other cases, especially in the cases affecting the legislation of California on the subject of the Chinese. It is held that every one has a

right to pursue an ordinary calling on terms of equality with all other persons in similar circumstances; that is, a calling not in any way injurious to the community, or likely to become so.    The Court did not, in *Powell vs. Pennsylvania*, regard the making of oleomargarine as an ordinary business; nor in *McGahey vs. Virginia*, 135 *U. S.*, 712, was the traffic in ardent spirits so regarded.    In the *Chinese Cases, Re Parrott*, 6 *Sawyer*, 349; *Re Ah Chong*, 6 *Sawyer*, 451; and *Yick Wo vs. Hopkins*, 118 *U. S.*, 356, the legislation in question was directed against the Chinese, and was intended to prevent them from earning a livelihood by their own labor; or, at least, to impede and embarrass them as much as possible in their efforts to do so.    This was most clearly evident, not only from the statutes and ordinances themselves, but from the Article in the Constitution of California, under which they were framed.    This Article (19th) was entitled "Chinese," and it provided that no corporation should employ, directly or indirectly, in any capacity, any Chinese or Mongolians; that no Chinese should be employed on any State, county, municipal or other work, except in punishment for crime; it declared that the presence of foreigners ineligible to become citizens (meaning the Chinese) was dangerous to the well-being of the State; and the Legislature were directed to discourage their immigration by all means within their power, and were also directed to delegate all necessary power to the incorporated cities and towns of the State for the removal of Chinese beyond their limits, or for their location within prescribed portions of those limits; and were also directed to provide the necessary legislation to prohibit the introduction of Chinese into the State.    One of the Judges in *Parrott's Case* said of this Article. "It is in open and seemingly contemptuous violation of the provisions of the treaty which give to the Chinese the right to reside here with all the privileges,

immunities and exemptions of the most favored nation. It is, in fact, but one and the latest of a series of enactments designed to accomplish the same end." 6 *Sawyer,* 365. It was apparent to the Courts which decided these cases that, although the statutes and ordinances in question were in the form and fashion of police regulations, yet in reality, in substance and in effect, they were enactments to take away from the Chinese the right to labor for a living.

They struck at those inalienable rights which belong to human beings at all times and in all places. They denied them the equal protection of the laws in particulars essential to their means of existence. Their evident effect and purpose were to accomplish an unconstitutional result, and therefore they were necessarily declared to be void. The statute now before us oppresses no one, and was intended to oppress no one. It does not take from any man a solitary right, privilege or immunity. It subjects no one to penalties for its violation which are not imposed equally on all offenders. It does not, it is true, make an equal partition of the privilege of liquor selling among all classes of persons. But there is no warrant for supposing that legislative control over this traffic must conform to any such standard. It is not crippled by any such restraint. It overrides all private interests and embraces all means which are necessary and proper to protect the public from evils connected with the subject. Assuredly the Supreme Court did not consider this control as limited by the necessity of making an equal distribution of favors, when it said in speaking of the trade in liquor and its consequences: "The police power which is exclusively in the States is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority." *Mugler vs. Kansas,* 123 *United States,* 659. Nor

is any such limitation consistent with the decisions in *Stone vs. Mississippi*, 101 *United States*, 814; *Beer Co. vs. Massachusetts*, 97 *United States*, 25; and *Fertilizing Company vs. Hyde Park*, 97 *United States*, 659. In one of these cases a franchise which had been purchased from the State was taken away from the purchaser without compensation to him, because it was considered by the Legislature to be hurtful to the public morals. In the other two cases, by the exertion of the police power, property of vast amount was rendered valueless, although it had been acquired under the express sanction of the Legislature. It is needless to refer again to the *Slaughter House Cases*, where there was a severe discrimination in favor of a single corporation and against every one else, solely because the protection of the public health was involved.

It has been maintained that the appellant (Trageser) has rights under existing treaties which have been infringed by the denial of licenses to aliens. Our opinion on this question has been sufficiently indicated. But a few words more may be added. If we assume, for the sake of argument, that Trageser has under treaties every right which a citizen could have, the answer is that no citizen of the United States can complain because a police regulation denies him the privilege of selling liquor, even if the privilege is granted to other citizens. We are unable to conceive that any one, citizen or alien, can acquire rights which could in any way control, impair, impede, limit or diminish the police power of a State. Such power is original, inherent and exclusive; it has never been surrendered to the General Government, and never can be surrendered without imperiling the existence of civil society.

The Act of Assembly involved in this controversy being in our opinion in all respects a valid law, it is perhaps unnecessary to say anything more; but we will observe that, even if the clause relating to aliens were

unconstitutional, the other portions of the statute would not be affected. Aliens could not even, in that event, obtain licenses to retail liquor without the approval of the Board of Commissioners.

The order refusing the mandamus must be affirmed.

*Order affirmed.*

ALVEY, C. J., and MCSHERRY, J., concurred in the affirmance of the order appealed from, refusing the mandamus, but for reasons different from those assigned in the opinion of the majority of the Court.