[No. 16910.  Department Two.  October 24, 1922.]

## R. ASAKURA, *Respondent*, v. THE CITY OF SEATTLE, et al., *Appellants*.[1]

CONSTITUTIONAL LAW (48, 112)—POLICE POWER—LICENSES—REGU-
LATION OF BUSINESS.  The business of pawnbroking involves such a
jeopardy of public safety as to warrant police regulation by a city,
and no individual has an inherent right to engage in the same.

SAME (48, 112).  The business of pawnbroking being a privilege
and not a right, a city may provide that license therefor shall be
granted to citizens of the United States and not to aliens.

TREATIES (2)—CONSTRUCTION—RIGHT TO "CARRY ON TRADE"—
PAWNBROKERS—RIGHTS OF ALIENS.  The business of pawnbroking
is not within the provisions of the treaty of April 5, 1911, between
United States and Japan guaranteeing to the subjects of Japan
residing in the United States the right to "carry on trade" upon
the same terms as our own citizens.

Appeal from a judgment of the superior court for
King county, Frater, J., entered December 28, 1921,
in favor of the plaintiff, in an action for an injunction,
tried to the court.  Reversed.

*Walter F. Meier,* and *Charles T. Donworth,* for ap-
pellants.

*Guie & Halverstadt,* for respondent.

MACKINTOSH, J.—Has a city the power to provide
by ordinance that everyone engaging in pawnbroking
must be a citizen of the United States?

The answer to this question determines this litiga-
tion, which is an action begun by a subject of the
Emperor of Japan seeking to enjoin the city of Seattle
from arresting the respondent for pawnbroking.

An ordinance was enacted by the proper city author-
ities in July, 1921, providing for the licensing and
regulating of the business of pawnbroking.  One of

[1]Reported in 210 Pac. 30.

the sections of this ordinance provides that no one shall engage in pawnbroking without a license. Another section specifies "that no such license shall be granted unless the applicant be a citizen of the United States," etc.

Respondent's complaint alleges that he is a Japanese subject, and has resided in Seattle for six years prior to July, 1921; that, during such time, he has been a pawnbroker, and alleges that the ordinance hereinabove referred to is invalid as being in violation of the provisions of §·3, of article I, of the state constitution, and § 1 of the 14th amendment to the constitution of the United States, and in conflict with the treaty between the governments of the United States and Japan.

A decree was entered in conformity with the prayer of respondent's complaint, from which the city has appealed.

At the threshold we are met with the necessity of determining whether pawnbroking is a business in which any individual has an inherent right to engage. If it is such, then, of course, the respondent is entitled to the remedy he seeks. Or is pawnbroking a privilege which may be absolutely denied to any one or granted upon such terms and conditions and with such restrictions as the city may impose?

Certain lines of business activity have been from earliest times considered by the courts to contain elements which permit the restriction of those who may engage therein. Some of these elements have been the interference with the lives and property of the people generally, and the jeopardy of the public health, safety and morals. The courts have held that no one has an inherent right to pursue such traffic, but that such activities may be permitted under such

conditions as the sovereign exercising the police power may declare, and that the person enjoying such permission is exercising a privilege and not a right. Without hesitation, the courts have designated certain businesses as falling within the class of privileges. The elements will not differ in many of these occupations, and where they plainly may impair the public health, morals or safety, courts will be found unanimously upholding the placing of restrictions upon the class and character of persons who may be allowed to transact such businesses. Pawnbroking has not so often come before the courts for consideration, but we find that decisions conform to what is the general understanding of men in holding that pawnbroking is a business which is surrounded with some degree of menace to the public good. In certain of its aspects, pawnbroking may be harmless, but, on the other hand, it is common knowledge that, both on account of the nature of the business itself and somewhat on account of the character of those who engage in it, it offers a ready shelter for thievery, and to that extent encourages criminality. This aspect of the business has been recognized by both our state and city governments, for statutes and ordinances will be found which attempt to strictly regulate the manner in which pawnbroking may be conducted, and providing, among other things, for a constant and careful police inspection and control. So that, where the question as to the character of pawnbroking has arisen, we find the courts deciding that to be allowed to engage therein is a privilege and not an inherent right.

Probably as good an expression of this view as any is to be found in the case of *City of Grand Rapids v. Braudy,* 105 Mich. 670, 64 N. W. 29, 55 Am. St. 472, 32 L. R. A. 116, where the supreme court of Michigan says:

"It is common knowledge that thieves resort to these places [pawnbrokers] to dispose of their stolen goods, and that unscrupulous, and often times criminal, persons are engaged in the business. The business therefore comes expressly within the control of the police power of the state, and is properly subject to reasonable rules and regulations. A very clear abuse of this power must be shown in order to justify the court in declaring the regulations to be unreasonable and void. While this business is legitimate in the absence of any statute controlling it, no inalienable right exists to carry it on without complying with those provisions and restrictions which the legislative power of the state has seen fit to require. . . . The business is not necessary to the welfare of society or the public. The common council, with the knowledge of all the facts before them to a greater extent than courts can possibly have, have determined that it is well, in their judgment, to require these conditions. While the exercise of any arbitrary power may seem harsh, still we are of the opinion that this requirement is not so unreasonable as to require the courts to declare it void."

Similar language is used by the supreme court of Virginia in *Elsner Bros. v. Hawkins,* 113 Va. 47, 73 S. E. 479, Ann. Cas. 1913D 1278, as well as by the supreme court of California in *Levinson v. Boas,* 150 Cal. 185, 88 Pac. 825, 12 L. R. A. (N. S.) 575, and in *City of St. Joseph v. Levin,* 128 Mo. 588, 31 S. W. 101, 49 Am. St. 577, the supreme court of Missouri said:

"The city may not only regulate, but suppress, pawnbrokers, or refuse to license such occupation altogether. No person has the right to follow such occupation within the limits of said city without first obtaining a license from its authorities for that purpose, which may be granted or withheld at pleasure. The business is a privilege, not a right, and he who avails himself of it and derives its benefits must bear its burdens and conform to the laws in force regulating the occupation, if not illegal."

The supreme court of this state, in *Seattle v. Barto,* 31 Wash. 141, 71 Pac. 735, says this:

"It is not doubted that the business of pawnbroking is a proper subject of police regulation, nor is it doubted that it is within the province of the municipal authorities to make the business bear the costs of such regulation."

The supreme court of Indiana, in *Grossman v. City of Indianapolis,* 173 Ind. 157, 88 N. E. 945, and the supreme court of Missouri in *City of St. Louis v. Baskowitz,* 273 Mo. 543, 201 S. W. 870, in dealing with the conduct of junk shops (a business which in some aspects closely resembles that of pawnbroking), held similarly to the cases above cited.

Holding, then, that pawnbroking is a privilege and not a right, the question arises as to whether this privilege in the form of a license may be granted to citizens and refused to aliens. This question has also been before numerous courts, which have held that such distinction may properly be made for the reason that, being a privilege, it is liable to abuse, resulting in public harm, and may therefore properly be confined to such persons as may reasonably be supposed to have a full sense of responsibility to the country and a desire for its welfare, and persons who are attached to the principles of the government and well disposed to its good order and happiness. The legislative department of the government having determined this matter, the courts will not interfere with its conclusions. This question has sometimes arisen in the control of the liquor traffic, wherein that activity has been confined to citizens of the United States. *Bloomfield v. State,* 86 Ohio 253, 99 N. E. 309, Ann. Cas. 1913D 629, 41 L. R. A. (N. S.) 726; *Trageser v. Gray,* 73 Md. 250, 20 Atl. 905, 25 Am. St. 587, 9 L. R. A. 780. The rule has also been applied in ordinances

regulating peddling. *Commonwealth v. Hana,* 195 Mass. 262, 81 N. E. 149, 122 Am. St. 251, 11 L. R. A. (N. S.) 799. Granting the privilege of laboring upon public works, *People v. Crane,* 214 N. Y. 154, 108 N. E. 427, Ann. Cas. 1915B 1254; *Crane v. People of State of New York,* 239 U. S. 195, and the right to operate motor vehicles on public streets. *Morin v. Nunan,* 91 N. J. L. 506, 103 Atl. 378. The supreme court of this state, in *State v. Ames,* 47 Wash. 328, 92 Pac. 137, has held that the privilege of pilotage in the waters of the state could properly be limited to citizens.

This court, in the case of *State ex rel. Sayles v. Superior Court,* 120 Wash. 183, 206 Pac. 966, has established the rule that a municipality could prohibit any business which was inherently vicious and harmful, and in effect has said that, in cases where the business is of such character, the city can say who shall and who shall not engage in it.

The case of *Yick Wo. v. Hopkins,* 118 U. S. 356 (commonly known as the Chinese Laundry Case) was one involving the attempt by the city to regulate a business which was not of itself harmful or injurious, and is on that account distinguishable from the case at bar, and is therefore of no controlling significance.

We find nothing, therefore, in the ordinance in conflict with Federal or state constitutions.

Having determined these questions, there is presented the one as to whether the ordinance is in conflict with the treaty between the governments of the United States and Japan, proclaimed April 5, 1911. Passing the question of whether a treaty-making power can impair or destroy the police power of a sovereign state, we are content to rest our decision on this phase of the case upon the language of the treaty itself, which guarantees only to the subject of Japan residing in the United States the right to

"carry on trade" upon the same terms as our own citizens. The business of pawnbroking cannot be held to be a right to "carry on trade." The supreme court of the United States in *Patsone v. Commonwealth of Pennsylvania*, 232 U. S. 138, and *Heim v. McCall*, 239 U. S. 175, Ann. Cas. 1917B 287, has held that equality of rights provisions in treaties do not include the privilege of game hunting or laboring on public works. So equality of opportunity to "trade" means only the pursuit of those callings in which an individual has an inherent right to engage. The treaty does not secure to an alien the right to exercise a privilege.

Pawnbroking being a business that the state in the exercise of its police power, and the city through its delegated right, may either absolutely prohibit or conditionally permit by means of a license, and the fact of alienship has been deemed sufficient ground for the refusal of a license, the courts will not sit in review of the action of the municipality, and will not reverse the action of the municipality, in the absence of unreasonableness akin to fraud; for municipal corporations are *prima facie* the sole judges respecting the reasonableness of such regulations and only in extreme cases will the courts interfere with the exercise of their judgment.

The action should have been dismissed, and the judgment of the lower court is reversed.

PARKER, C. J., HOLCOMB, MAIN, and HOVEY, JJ., concur.