## ALCOHOLIC BEVERAGES

CONSTITUTIONAL LAW – WHETHER NON-DURATIONAL RESIDENCY REQUIREMENTS FOR ALCOHOLIC BEVERAGES LICENSEES IN HARFORD COUNTY ARE PERMISSIBLE UNDER THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

May 4, 2021

*The Honorable Walter A. Tilley, III*
*Chair, Liquor Control Board for Harford County*

On behalf of the Liquor Control Board for Harford County ("Harford County Board"), you have requested our opinion on the constitutionality of the non-durational residency requirements for alcoholic beverages licenses in Harford County, as amended by Chapter 462 of 2020.[1]  Chapter 462 abolished *durational* residency requirements for alcoholic beverages licenses, which had required licensees to reside in the relevant county (or, for some licenses, in the State) for a certain period of time before applying for a license. The stated purpose of that change, *see* 2020 Md. Laws, ch. 462, § 2, was to bring Maryland law into compliance with the decision of the United States Supreme Court in *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) ("*Thomas*"), which had held that Tennessee's durational residency requirement for alcoholic beverages licenses—requiring the applicant to have resided in the state for a period of two years prior to the application—violated the Commerce Clause of the U.S. Constitution by discriminating against nonresidents of the state and was not saved by the Twenty-First Amendment's reservation of state authority to regulate alcohol.[2]

---

[1] The Liquor Control Board for Harford County is formally named the Board of License Commissioners for Harford County, Md. Code Ann., Alc. Bev. ("AB") §§ 22-201, 22-301, and performs the usual functions of a Board of License Commissioners:  the licensing and regulation of retail sellers of alcoholic beverages in Harford County, *see* 99 *Opinions of the Attorney General* 31, 32, 35 n.6 (2014).

[2] The conclusion that durational residency provisions violate the dormant Commerce Clause was not a dramatic break with prior law. Other courts had reached the same conclusion, *Cooper v. McBeath*, 11 F.3d 547, 548 (5th Cir. 1994); *Southern Wine & Spirits of Tex., Inc. v. Steen*, 486 F. Supp. 2d 626, 628 (W.D. Tex. 2007); *Glazer's Wholesale Drug Co., Inc. v. Kansas*, 145 F. Supp. 2d 1234, 1244 (D. Kan. 2001),

At the same time, however, the General Assembly in enacting Chapter 462 also retained *non*-durational residency requirements for alcoholic beverages licenses issued in Harford County and many other counties in Maryland, as well as for certain alcoholic beverages licenses issued by the State. *See* 2020 Md. Laws, ch. 462. Under those non-durational residency requirements, licensees— or, in some cases, at least one licensee—must reside in the relevant jurisdiction at the time of the license application, and in many jurisdictions, including Harford County, the licensee is also required to remain a resident throughout the term of the license. *See, e.g.*, AB §§ 4-103(b), 22-1401(a)(2), 22-1402(a), 22-1405(a)(2), (3). The question you have asked is whether the non-durational residency requirements applicable in Harford County can survive under the Commerce Clause in light of *Thomas*.[3]

As we will explain, it is our view that Harford County's non-durational residency requirements would likely also fail under the reasoning of *Thomas*. The Supreme Court's analysis in *Thomas* did not distinguish between durational and non-durational residency requirements. In finding the durational requirements there to be unconstitutional, the Court rejected several justifications for a durational residency requirement under the Commerce Clause, reasoning that nondiscriminatory alternatives could advance the same objectives. And those nondiscriminatory alternatives could just as easily advance the objectives of a *non*-durational residency requirement. Thus, we think that a court applying *Thomas* would likely invalidate the current non-durational residency requirements for alcoholic beverages licenses in Harford County. Although we recognize that much of this analysis may apply to the other non-durational residency requirements in Chapter 462, we have not separately analyzed each residency requirement in the Alcoholic Beverages Article and do not specifically address whether any of those other requirements are constitutional.

---

as had attorneys general in at least two states, Tenn. Op. Att'y Gen. 14-83, 2014 WL 4664826 (Sept. 12, 2014); Tenn. Op. Att'y Gen. 12-59, 2012 WL 2153491 (June 6, 2012); Kan. Op. Att'y Gen. 06-12, 2006 WL 1722435 (June 21, 2006).

[3] To be clear, when we refer to residency requirements in this opinion, we mean the residency requirements for alcoholic beverages *licensees*. We do not address restrictions that require the licensed business itself to be located in or have a physical presence in the State or the relevant local jurisdiction within the State.

**I**
**Background**

*Thomas* considered the interaction of two provisions of the United States Constitution: Congress's power "[t]o regulate Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3 (the "Commerce Clause"), and the Twenty-First Amendment's reservation of state authority to regulate the alcohol trade, *id.* Amend. XXI, § 2. The Commerce Clause has long been understood not only as an affirmative grant to Congress of power to regulate interstate commerce, but also as a restriction on states' ability to adopt "protectionist" legislation that "unduly restrict[s] interstate commerce." *Thomas*, 139 S. Ct. at 2459. That implied "negative command" is typically referred to as "the dormant Commerce Clause." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

The dormant Commerce Clause's limitation on state authority is in some tension with the Twenty-First Amendment, ratified in 1933, which ended nationwide alcohol prohibition but also provided:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

U.S. Const., Amend. XXI, § 2 ("Section 2"). Section 2 was intended "to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens." *Thomas*, 139 S. Ct. at 2474. It was left unclear, however, whether Section 2 superseded other constitutional limitations on state regulatory authority, such as the Commerce Clause, and authorized state alcohol regulations that the federal Constitution would otherwise prohibit, such as provisions favoring the state's own residents over nonresidents.

### A. *Procedural History in* **Thomas**

*Thomas* involved a provision of Tennessee law that required applicants for an initial license to have resided in the State for the prior two years. The Tennessee Attorney General had twice opined that this statute was unconstitutional. In the first opinion, Tenn. Op. Att'y Gen. 12-59, 2012 WL 2153491 (June 6, 2012), the Attorney General concluded that the two-year residency requirement

for a retail liquor license violated the Commerce Clause in light of the Sixth Circuit's decision in *Jelovsek v. Bredesen*, 545 F.3d 431, 439 (6th Cir. 2008), which had concluded that Tennessee's two-year residency requirement for a winery license was facially discriminatory against out-of-state wineries. In the second opinion, Tenn. Op. Att'y Gen. 14-83, 2014 WL 4664826 (Sept. 12, 2014), the Attorney General concluded that an amended version of the law that retained the two-year residency requirement also violated the Commerce Clause. As a result, the Tennessee Alcoholic Beverage Commission ("TABC") stopped enforcing the provision. *Thomas*, 139 S. Ct. at 2458.

Two years later, two companies—one formed as a limited liability company but owned by residents of Maryland and one owned and controlled by two individuals who had only recently moved to Tennessee—applied for retail licenses. Neither met the two-year residency requirement. In line with the Attorney General's opinions, TABC staff recommended approval of the applications, *Byrd v. Tennessee Wine & Spirits Retailers Ass'n*, 259 F. Supp. 3d 785, 788 (M.D. Tenn. 2017), but the Tennessee Wine and Spirits Retailers Association ("the Association") heard of the recommendation and threatened to sue. The Executive Director of the TABC responded by filing an action for declaratory judgment in Tennessee state court, which was subsequently removed to federal district court. *Thomas*, 139 S. Ct. at 2458.[4] The Executive Director asked the court to determine the validity of three provisions of Tennessee law: the two-year durational residency requirement for initial retail license applicants, Tenn. Code Ann. § 57-3-204(b)(2)(A); a requirement that a person seeking renewal of a retail license have resided in the state for at least 10 consecutive years, *id.*; and a requirement that all officers, directors, and stockholders of a corporate applicant meet the two-year durational residency requirement for initial applications and the 10-year residency requirement for renewal applications. Tenn. Code Ann. § 57-3-204(b)(3)(A)-(B).

The district court found that all three of these residency requirements violated the Commerce Clause. *Byrd*, 259 F. Supp.

---

[4] The Executive Director, represented by the Attorney General, apparently took inconsistent positions about the validity of the provision over the course of the litigation. *Byrd v. Tennessee Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 613 n.1 (6th Cir. 2018).

3d at 797.[5]  The Sixth Circuit affirmed, *Byrd v. Tennessee Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 612 (6th Cir. 2018), although one member of the panel dissented in part, and would have held that the two-year residency requirement was reasonably related to Tennessee's interest in "[p]romoting responsible consumption and orderly liquor markets," *id.* at 633 (Sutton, J., concurring in part and dissenting in part).

The Association then filed a petition for certiorari with the Supreme Court, arguing that the two-year durational residency requirement for initial retail license applicants (and officers and directors of corporate applicants) was consistent with the Commerce Clause.[6]  The Association no longer sought to defend the ten-year residency requirement for renewals or the residency requirements for shareholders of applicant corporations. *Thomas*, 139 S. Ct. at 2457; Brief for Petitioner, *Tennessee Wine & Spirits Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) (No. 18-96), 2018 WL 5962887, at *17.[7]  The Association also did not argue that a two-year durational residency requirement could be upheld against a Commerce Clause challenge if any commodity other than alcohol

---

[5] The court did not address the plaintiffs' alternative challenge under the federal Privileges and Immunities Clause.  That challenge would likely have been unsuccessful.  It has long been held that selling alcoholic beverages is not a privilege of citizens of the United States and thus state laws requiring state residence for that purpose do not violate the Privileges and Immunities Clause. *Mugler v. Kansas*, 123 U.S. 623, 657, 675 (1887); *Bartemeyer v. Iowa*, 85 U.S. 129, 133 (1873); *Trageser v. Gray*, 73 Md. 250, 255 (1890).  More modern courts have reached the same conclusion, *Lebamoff Enters., Inc. v. Whitmer*, 956 F.3d 863, 875 (6th Cir. 2020); *Glicker v. Michigan Liquor Control Comm'n*, 160 F.2d 96, 98 (6th Cir. 1947), which is not surprising in light of the fact that the Twenty-First Amendment gives the states the right to ban the sale of alcohol altogether.

[6] The Executive Director did not appeal the district court's decision and did not join the Association's petition for certiorari, which formally identified the Executive Director as a respondent rather than a petitioner. After the Court granted certiorari, however, the Attorney General of Tennessee filed a letter on behalf of the Executive Director supporting the Association's position. *Thomas*, 139 S. Ct. at 2458-59.

[7] The Supreme Court addressed this failure in dicta, saying these other provisions were "so plainly based on unalloyed protectionism that neither the Association nor the State [wa]s willing to come to their defense." *Thomas*, 139 S. Ct. at 2474.  The Court later described the challenged durational residency requirement as being "like the other discriminatory residency requirements that the Association is unwilling to defend," in that the predominant effect was "simply to protect the Association's members from out-of-state competition." *Id*. at 2476.

was involved. *Thomas*, 139 S. Ct. at 2462. Thus, the sole issue before the Supreme Court was whether Section 2 of the Twenty-First Amendment protected the action of the State in imposing a residency requirement that would clearly violate the Commerce Clause in any other context.

## B. *The Supreme Court's Decision in* Thomas

After a long discussion of the history of state attempts to regulate alcoholic beverages and congressional efforts to shield that regulation from Commerce Clause and other challenges in the years leading up to the adoption of the Eighteenth Amendment, the *Thomas* Court stated its view that Section 2 was meant to "'constitutionaliz[e]' the basic understanding of the extent of the States' power to regulate alcohol that prevailed before Prohibition." *Thomas*, 139 S. Ct. at 2467-68 (citing *Craig v. Boren*, 429 U.S. 190, 206 (1976); *Granholm v. Heald*, 544 U.S. 460, 484 (2005)). The Court further concluded that this "basic understanding" did not permit states "to impose protectionist measures clothed as police-power regulations." *Thomas*, 139 S. Ct. at 2468. In other words, the pre-1933 understanding of the Commerce Clause constrained states' regulatory authority under Section 2.

The Court recognized that early cases under Section 2 seemed to rely on the theory that Section 2 overrode all other provisions of the Constitution, *id*. at 2468, but explained that subsequent cases showed that the Court ultimately "saw that [Section] 2 cannot be read that way." *Id*. at 2469. The Court noted, for instance, that it had previously scrutinized laws regulating alcoholic beverages for compliance with other portions of the Constitution including the Free Speech and Establishment Clauses of the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the Import-Export Clause. *Id*.

The Court further explained that the latter approach had also been applied in cases raising Commerce Clause objections to alcoholic beverages laws. *Id*. at 2470. In *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273, 276 (1984), for example, the Court invalidated a discriminatory tax that applied to all out-of-state liquor but exempted certain Hawai'i products. Similarly, in *Healy v. Beer Institute*, 491 U.S. 324, 340-41 (1989), the Court found that a requirement that out-of-state shippers of beer affirm that their wholesale price for products sold in Connecticut was no higher than the prices they charged to wholesalers in bordering states

violated the Commerce Clause because it discriminated against brewers and shippers of beer engaged in interstate commerce. And in *Granholm v. Heald*, the Court struck down a set of discriminatory direct-shipment laws that favored in-state wineries over out-of-state competitors.[8] 544 U.S. at 492-93. Thus, the Court concluded that, while it had "acknowledged that [Section] 2 grants States latitude with respect to the regulation of alcohol," it had also "repeatedly declined to read [Section] 2 as allowing the States to violate the 'nondiscrimination principle' that was a central feature of the regulatory regime that the provision was meant to constitutionalize." *Thomas*, 139 S. Ct. at 2470.

The Court went on to reject the Association's arguments about how the line between Section 2 and the Commerce Clause should be drawn. Specifically, the Court rejected the argument that the nondiscrimination principle applied only to discrimination against out-of-state products and not to laws regulating in-state alcohol distribution. *Id*. at 2470-71. Although the Court had previously suggested in *Granholm* that Section 2 protects the traditional "three tier system" of alcohol distribution, under which manufacturers, wholesalers, and retailers must obtain state licenses, the *Thomas* Court opined that durational residency requirements could not be considered an essential feature of that system, given that many states with three-tiered systems do not impose durational residency requirements and some do not impose residency requirements at all. *Id*. at 2471-72. The Court also held that the long history of durational residency requirements did not mean that they were constitutional. *Id*. at 2472-73.

In sum, the Court concluded that Section 2 "allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests." *Id*. at 2474. Thus, the court crafted an "inquiry" that would apply specifically to alcoholic beverage regulations, in an effort to balance the interests of Section 2 and the Commerce Clause. *Id.*

---

[8] *See also Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 716 (1984) (invalidating ban on TV wine ads emanating from other states); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 114 (1980) (invalidating wine-related resale price maintenance and price posting statutes); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 331-32 (1964) (invalidating regulation of alcohol passing through JFK Airport that would not be used until arrival at international destination).

In conducting that inquiry, the Court looked to "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* at 2474. The Court also identified two relevant factors to help determine whether that was the case: (1) whether the requirement "actually promotes public health or safety" and (2) whether "nondiscriminatory alternatives would be insufficient to further those interests." *Id.* If consideration of these factors demonstrates that "the predominant effect of a law is protectionism, not the protection of public health or safety, it is not shielded by [Section] 2" and is instead subject to ordinary Commerce Clause scrutiny. *Id.*[9] The Court placed the burden on the defender of the law to provide "concrete evidence" in support of the law's nonprotectionist justifications, stating that "'mere speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause." *Id.*

Because the Association had relied on its argument that the Commerce Clause did not apply (and the State offered no independent argument), the Court found the record "devoid of any 'concrete evidence' showing that the 2-year residency requirement actually promotes public health or safety," nor was there "evidence that nondiscriminatory alternatives would be insufficient to further those interests." *Id.* The Court then considered and rejected all of the nonprotectionist justifications for the requirement that had been suggested in the arguments before the Court and found that "the Association has fallen far short of showing that the 2-year durational-residency requirement for license applicants is valid." *Id.* at 2475-76.

For example, in response to the Association's argument that the residency requirements were justified because resident retailers are "amenable to the direct process of state courts," the Court suggested that problem could easily be addressed by requiring nonresident licensees to designate an agent to receive process or to consent to suits in Tennessee courts. *Id.* at 2475 (citing *Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994)).

---

[9] Under ordinary Commerce Clause scrutiny a provision that discriminates against interstate commerce is "virtually *per se . . .* invalid[]," *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978), and will be upheld only if the state is able to show that it is "narrowly tailored to 'advanc[e] a legitimate local purpose,'" *Thomas*, 139 S. Ct. at 2461 (citing *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008)).

Similarly, in response to the Association's argument that the two-year requirement improved the ability of the State of Tennessee to determine the fitness of applicants, the Court pointed out that state law already required criminal background checks and that more searching checks could be ordered if necessary, concluding that "if the State desires to scrutinize its applicants thoroughly . . . it can devise nondiscriminatory means short of saddling applicants with the burden of residing in the State." *Id.* (internal quotation marks and alterations omitted). The Court went on to explain that the residency requirement was not well-designed to serve the goal of judging the fitness of applicants because, if a person were to move to the state with the intent to apply for a license in two years, the state would have no reason to begin an investigation until the person actually applied for a license at the end of the two-year period. *Id.* Moreover, a prospective applicant would not be obliged "to be educated about liquor sales, submit to inspections, or report to the State" during the two-year waiting period. *Id.*

The Court also rejected the argument that the residency requirement was necessary to maintain oversight over liquor store operators. The Court pointed out that the retail stores in question were located in the state, allowing the state to monitor their operations through on-site inspections and audits and to address violations of the law with penalties up to and including revocation of the license. *Id.*

Finally, in response to the argument that the two-year residency requirement would promote responsible alcohol consumption, the Court found that it was "very poorly designed" to accomplish this purpose because it applied to the license holder rather than the person who would actually be making the sales, because it required residence in the state generally rather than in the community where the store would be located, and because a license holder who lived right over the border might actually be closer to the community in question than a license holder in a distant part of the same state. *Id.* at 2476. The Court also pointed to other nondiscriminatory alternatives that could promote responsible consumption, including limiting the number of licenses in an area, placing volume limits on sales to individuals, mandating more extensive training for managers and employees, requiring managers and employees to show familiarity with the neighborhood, or requiring managers of liquor stores to obtain permits, satisfy background checks, and undergo "alcohol awareness" training. *Id.*

## C.   *Residency Requirements in Harford County*

After the Supreme Court's decision in *Thomas*, the General Assembly repealed Maryland's durational residency requirements for alcoholic beverages licenses and replaced them with non-durational residency requirements.  *See* 2020 Md. Laws, ch. 462. As relevant here, under the law as amended in Chapter 462, individuals applying to the Harford County Board for an alcoholic beverages license must reside in the county at the time of the application and during the license term.  AB § 22-1402.  An alcoholic beverages license may only be issued for the use of a partnership if all partners meet the same residency requirement.  *Id.* § 22-1401(a)(2) (incorporating AB § 4-103).  And the Harford County Board may issue a license for the use of another type of legal entity, such as a corporation or limited liability company, only if at least one officer and shareholder of the entity is a resident of the county and acts as a day-to-day manager of the business.  *Id.* § 22-1405.  These requirements apply to all classes of licenses issued by the Harford County Board.  *See id.* §§ 22-1402, 22-1405.

## II
## Analysis

We now turn to your question of whether the non-durational residency requirements for licensees that were retained in Chapter 462 for Harford County are unconstitutional under the Supreme Court's decision in *Thomas*.

## A.   *The Attorney General's Role in Assessing the Constitutionality of a Statute*

When our Office is asked to advise on the constitutionality of a Maryland law, we must be "mindful of the obligation of the Attorney General to defend, in litigation, the constitutionality of statutes enacted by the Legislature."  93 *Opinions of the Attorney General* 154, 160 (2008) (citing *State v. Burning Tree Club, Inc.*, 301 Md. 9, 36-37 (1984)).  However, we also have an obligation, at least when there is "neither pending nor imminent litigation," to provide an opinion with "our best legal analysis" on the constitutionality of the law at issue so as to help our clients avoid constitutional liability and "administer statutes in compliance with constitutional provisions."  *Id.* at 160-61; *see also, e.g.*, 71 *Opinions of the Attorney General* 266, 269-70 (1986) (concluding that statute debarring certain labor-law violators from state contracts was preempted pursuant to the federal Supremacy Clause,

in light of Supreme Court decision invalidating a similar Wisconsin statute); 70 *Opinions of the Attorney General* 3, 12, 15, 17-18 (1985) (concluding that various abortion laws were unconstitutional pursuant to then-recent Supreme Court authority); Letter from Kathryn M. Rowe, Assistant Attorney General, to the Hon. Edward R. Reilly (Dec. 12, 2019) (advising that a citizenship requirement for liquor license holders is likely unconstitutional); Letter from Gerald Langbaum, Assistant Attorney General, to Joseph P. Oates & Joseph Val Collom (July 19, 1976) (same).[10]

To be clear, "even if we conclude that the statute is constitutionally deficient, an Attorney General opinion cannot itself invalidate an act of the General Assembly." 93 *Opinions of the Attorney General* at 161. It is, after all, not the role of the Attorney General to "declare" laws unconstitutional. 63 *Opinions of the Attorney General* 644, 645 (1978). "Only a court has the power to declare a statute invalid because it does not comply with constitutional requirements." *First Cont'l Sav. & Loan Ass'n v. Director, State Dep't of Assessments & Taxation*, 229 Md. 293, 301 (1962). But, with those limitations in mind, we will provide our "best legal analysis," employing "all of the presumptions in favor of, and against, the statute that a court would consider," 93 *Opinions of the Attorney General* at 160, to determine whether Harford County's non-durational residency requirements are likely to be found unconstitutional.

### B. The Application of **Thomas** *to Harford County's Non-Durational Residency Requirements*

The residency requirement at issue in *Thomas*, like the ones in effect in Harford County prior to the passage of Chapter 462, required that the applicant be a resident of the jurisdiction for a certain period of time prior to filing an application for a license. But in holding that Tennessee's durational residency requirement

---

[10] When reviewing bills that have been passed by the Legislature prior to their approval or veto by the Governor, this Office applies what we call a "not clearly unconstitutional" standard. 93 *Opinions of the Attorney General* at 161 n.12 (citing 71 *Opinions of the Attorney General* 266, 272 n.12 (1986)). Because Chapter 462 has already been enacted, we need not consider in this opinion whether it was "clearly unconstitutional" under that standard. But even if Chapter 462 were clearly unconstitutional, we would not have recommended that the Governor veto it because the bill was, at the very least, less constitutionally problematic than the law as it existed at the time, in that it eliminated the type of durational residency requirements that the Supreme Court had expressly struck down in *Thomas*.

violated the Commerce Clause, the *Thomas* Court never suggested that a non-durational residency requirement—i.e., that the licensee be a resident of the jurisdiction only at the time of the application or from the time of the application through the end of the license period—would merit different treatment. Although the Court's opinion primarily spoke in terms of durational residency requirements because that was the nature of the licensing regime before it, *Thomas*'s reasoning strongly suggests that non-durational residency requirements will likely be difficult to defend. *Cf.* 139 S. Ct. at 2471 (rejecting Association's effort to limit *Granholm* to the regulatory regime at issue in that case).

As an initial matter, Tennessee's durational residency requirement triggered Commerce Clause scrutiny because it "discriminate[d] on its face against nonresidents." *Id.* at 2474. A non-durational residency requirement does the same; it expressly bars nonresidents from applying for or retaining an alcoholic beverages license, whereas residents may do so. And although the residency requirements at issue here require licensees to reside *in Harford County* (meaning that residents of other Maryland jurisdictions are also ineligible), it seems clear based on Supreme Court precedent that a requirement of residency in the county still facially discriminates against interstate commerce. *See, e.g.*, *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 361-63 (1992) (invalidating Michigan statute preventing landfills from accepting out-of-county waste, reasoning that allowing such measures at the county level, when they are not permissible at the state level, would enable a state to "avoid the strictures of the Commerce Clause"); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994) (observing that an ordinance excluding out-of-locality as well as out-of-state competition "just makes the protectionist effect of the ordinance more acute").

Accordingly, a court confronted with a non-durational residency requirement like the ones applicable in Harford County would apply the test developed in *Thomas*, arising from the intersection of the Commerce Clause and the Twenty-First Amendment. That test, in turn, asks whether "the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground" and, in answering that question, examines whether the requirement "actually promotes public health or safety" and whether

"nondiscriminatory alternatives would be insufficient to further those interests." *Thomas*, 139 S. Ct. at 2474.[11]

The Association and its amici raised several health and safety justifications for Tennessee's durational residency requirement, each of which the Court rejected as "implausible on its face." *Id.* at 2475. Critically, several of the justifications the Court considered and rejected are best understood not as justifications for requiring a licensee to have two years of residency prior to the application, but as arguments for requiring residency at the time of the application and/or during the period of the license—that is, as arguments that would support *non-durational* residency requirements like Harford County's.

For example, the Association argued in *Thomas* that a residency requirement was needed to ensure that licensees would be amenable to service of process in Tennessee. *Id.* at 2475. It would make little sense to require that individuals be amenable to service of process *prior to* their application for a license, so this

---

[11] The Supreme Court did not fully explain how the test it established in *Thomas* for alcoholic beverage regulations differs from the standard dormant Commerce Clause analysis. The *Thomas* Court indicated that Section 2 gives states more "leeway" to regulate alcohol than they would otherwise have under the Commerce Clause. 139 S. Ct. at 2457-74. But both the *Thomas* test and the standard Commerce Clause test require that the law be supported by nonprotectionist justifications and that a reviewing court examine whether nondiscriminatory alternatives would advance the same purpose. *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 138 (1986). As one possible distinction, *Thomas* did suggest that Section 2 protects the "essential feature[s]" of traditional state "three-tiered alcohol distribution systems." 139 S. Ct. at 2471. Such systems require alcoholic beverage producers to sell to state-regulated wholesalers, wholesalers to sell only to state-regulated retailers, and only state-regulated retailers to sell to consumers. *Id.* at 2457. Thus, the Twenty-First Amendment may allow a state, in the interest of maintaining the integrity of its three-tier system, to require alcohol retailers (as contrasted from their owners) to be physically located in the state—a requirement which might be questionable under the ordinary Commerce Clause framework. *See Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1182-84 (8th Cir. 2021) (upholding Missouri requirement that "retail liquor stores be physically located within the State" as a "core provision[] of Missouri's three-tiered system"); *Lebamoff Enters., Inc.*, 956 F.3d at 870, 875-76 (same in Michigan). However, the *Thomas* Court was clear that it did not consider residency requirements for liquor store *owners*—whether durational or not—to be an essential feature of the traditional three-tier system. *See* 139 S. Ct. at 2471-72. In any event, we do not decide here the exact contours of how the Court's test in *Thomas* differs from its ordinary dormant Commerce Clause test.

argument makes the most sense as a justification for requiring residency *after* issuance of the license. Similarly, the Association argued that residency requirements would make it easier for the state to oversee the operators of liquor stores. *Id.* This argument, too, seems to be a defense of requiring licensees to maintain residency during the license term, when the business is actually operating. The Court rejected both of these justifications for a residency mandate, noting that nondiscriminatory means were available to pursue each objective. *Id.* And more to the point, the alternatives the Court suggested, such as requiring applicants to appoint an in-state agent for service of process or mandating that retail staff undergo alcohol-awareness training, would function equally well as substitutes for a non-durational residency requirement. *See id.* at 2475-76.

The Court's analysis thus suggests that it did not merely consider the durational aspect of Tennessee's residency requirement—that is, the requirement that applicants reside in the state for two years *before* applying—but instead evaluated and rejected the purported benefits of residency requirements for license applicants more generally.[12] Indeed, it is unclear what health or safety interests would be advanced by a non-durational residency requirement like Harford County's that would not *also* be advanced by a durational residency requirement. In other words, it does not appear that a non-durational requirement would have any additional advantages that the *Thomas* Court did not consider.

In fact, in some ways, the justification for a non-durational residency requirement is weaker than the justification for a durational residency requirement. For example, if residency requirements promote responsible sales practices by ensuring retailers have a stake in the community, then a durational residency requirement is superior to a non-durational requirement because it ensures stronger community ties.[13] Given that it is unclear what, if

---

[12] The dissenting opinion in *Thomas* also appeared to assume that the majority opinion's analysis would govern all residency requirements, not just durational residency requirements. *See* 139 S. Ct. at 2484 (Gorsuch, J., dissenting) (wondering whether, "if residency requirements are problematic," a state may require a retailer to have a physical presence in the state).

[13] *See Byrd*, 883 F.3d at 633 (Sutton, J., concurring in part and dissenting in part) ("Requiring individual retailers to reside in one place

any, health or safety advantages a non-durational residency requirement would have over a durational requirement, we think the Court would likely reject a non-durational residency requirement similar to Harford County's if one were before it.

Attorneys general in other states have reached similar conclusions. The Attorney General of Oklahoma, for instance, has opined that "the inescapable conclusion from [*Thomas*] is that the U.S. Supreme Court would strike down *all* residency requirements" for alcoholic beverage retailers or wholesalers, because "the Court's logic extends to non-durational residency requirements and those outside the retail context." Okla. Op. Att'y Gen. 2019-13, 2019 WL 7424693, at *3-4 (Dec. 31, 2019). Similarly, the Attorney General of Kansas recently concluded that, in light of *Thomas*, a "constitutional challenge to . . . a 'non-durational' residency requirement" would "likely be successful," because *Thomas*'s reasoning offers no basis for distinguishing between durational and non-durational requirements. Kan. Op. Att'y Gen. 2020-11, 2020 WL 7422704, at *2 (Dec. 10, 2020).[14]

---

for a sustained, two-year period ensures that they will be knowledgeable about the community's needs and committed to its welfare."); *see also, e.g.*, Brief for U.S. Alcohol Policy Alliance et al. as Amici Curiae Supporting Petitioner, *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) (No. 18-96), 2018 WL 6168786, at *15 ("[R]equiring two years of residency, rather than something nominal, like days or weeks, enhances the prospects that retailers are firmly anchored in the state and have meaningful communal relationships that matter to them.").

[14] We are not aware of any federal or state court decision that has directly addressed this question after *Thomas*. One federal appeals court, in concluding that a state may require alcohol retailers to be physically located in the state, did characterize the Missouri licensing scheme at issue as involving a separate "residency" requirement and did not reject that requirement as unconstitutional. *Sarasota Wine Mkt., LLC*, 987 F.3d at 1177. However, the focus of the court's opinion was on a different question, namely, the combined effect of the Missouri provisions—especially the physical-presence requirement—that prevented out-of-state alcoholic beverage retailers from shipping directly to Missouri consumers. *See id.* at 1182-84. And it also appears that the plaintiff in *Sarasota* could have satisfied the Missouri residency requirement simply by appointing a Missouri resident as the manager of a physical retail location in Missouri. *See id.* at 1178-79 & n.6. *Sarasota* thus did not decide the validity of a non-durational residency requirement imposed directly on the owner and licensee of an alcohol retail business. Instead, the court was focused on the constitutionality of a physical presence requirement for retailers. *See id.* at 1182-84. Of course, if one or more

To be sure, a non-durational residency requirement imposes less of a burden on nonresidents than a durational residency requirement. But that distinction would have little relevance under *Thomas*'s framework. *Thomas* indicates that whenever a state alcoholic beverages law facially discriminates against nonresidents, the burden shifts to the state to justify it; there is no threshold inquiry into whether the law imposes an undue or excessive burden on nonresidents. *See* 139 S. Ct. at 2474.[15]

We also recognize that the justification for Harford County's non-durational residency requirements may be at least marginally stronger than the justification for the Tennessee residency requirement in light of certain differences between the two statutory schemes. *See Thomas*, 139 S. Ct. at 2472 ("[E]ach variation must be judged based on its own features."). The *Thomas* Court recognized that a state has a legitimate interest in promoting "responsible sales and consumption practices" and considered the argument that a residency requirement promotes that interest by making it "more likely that retailers will be familiar with the communities served by their stores." *Id.* at 2475-76. This was the health-and-safety justification that the dissenting opinions in the Supreme Court and the Sixth Circuit appeared to find most plausible. *See id.* at 2482 (Gorsuch, J., dissenting); *Byrd*, 883 F.3d at 633 (Sutton, J., concurring in part and dissenting in part). The Court rejected that justification, though, because Tennessee's requirement (1) mandated only that licensees live in the state, not in the particular community where the business operates; (2) did not apply to bars and other businesses that serve alcohol for on-premises consumption; and (3) governed license holders rather

---

courts were ultimately to conclude that non-durational residency requirements are constitutional under *Thomas*, that would improve the chances that the Harford County requirements would be upheld.

[15] The *Thomas* Court also referred to the lack of record evidence supporting Tennessee's health and safety justifications for its durational residency requirement as one reason for rejecting those justifications. *See* 139 S. Ct. at 2474. But the Court's treatment of those justifications as facially implausible, in part because of the existence of "obvious" nondiscriminatory alternatives, suggests that it is unlikely that additional evidence would have altered the Court's conclusion. *See id.* at 2474-76; *see also* Kan. Op. Att'y Gen. 2020-11, 2020 WL 7422704, at *2 ("[W]e do not consider it likely that the State could make a showing of a legitimate local purpose that would satisfy constitutional muster, given the Supreme Court's unsympathetic attitude toward the public health and safety justifications put forth by Tennessee.").

than the individuals who actually make sales. *Thomas*, 139 S. Ct. at 2476 (majority op.).

Harford County's residency requirements, unlike Tennessee's, require the resident applicant to reside not just in the State but in the county, AB §§ 22-1402, 22-1405; do not distinguish between licenses for on-premises and off-premises consumption for purposes of the residency requirement; and, for applications on behalf of legal entities like corporations, require the resident applicant to be a "manager or supervisor" and to be "physically present on the premises for a substantial amount of time on a daily basis," AB § 22-1405(a)(4).[16] Thus, Harford County's residency requirements arguably better serve the objective of having locally rooted licensees promote responsible consumption.

Ultimately, however, we believe that a court applying *Thomas* would probably find these distinctions insufficient to produce a different result. The *Thomas* Court placed great weight on the availability of nondiscriminatory alternatives that would allow the state to pursue the same objectives. 139 S. Ct. at 2474-76. As to the community-knowledge justification specifically, the Court held that states could achieve the goal of promoting responsible consumption without discriminating against nonresidents in several ways, including by placing limits on sales or by requiring more extensive training for sales managers and employees. *Id.* at 2476. The same would presumably be true here. What is more, a requirement of residency in the county, like a requirement of residency in the State, still raises the concern, noted by the Court in *Thomas*, that a person who lives close to the community at issue but who happens to fall on the wrong side of a state or county border could be excluded from the market, while someone who lives farther away from the community, but within the same county, could qualify for a license. *See id.* In other words, a person's jurisdiction of legal residence will often be a poor proxy for their knowledge of a particular community.

Thus, even if Harford County's residency requirements more effectively "promote[] public health or safety" through community knowledge by licensees than the residency requirement in *Thomas*, *id.* at 2474, we suspect that a reviewing court would probably hold that the nondiscriminatory alternatives suggested in *Thomas* (e.g., requiring more extensive training) remain available and would serve the same interest "without discriminating against

---

[16] We need not decide whether the General Assembly could require a license holder to be physically present on the premises on a daily basis, *without* also requiring that the license holder reside in the State or county.

nonresidents," *id.* at 2476. That is, under the test set forth in *Thomas*, a court would still be likely to conclude that the Harford County residency requirements cannot be justified on "legitimate nonprotectionist ground[s]" and that, instead, the requirements are predominantly protectionist measures. *Id.* at 2474.

### III
### Conclusion

In our opinion, the non-durational residency requirements imposed on alcoholic beverages license applicants in Harford County likely violate the Commerce Clause of the United States Constitution as interpreted by the Supreme Court in *Thomas* and would not be saved by Section 2 of the Twenty-First Amendment. That is, the reasoning in *Thomas* seems to extend to Harford County's non-durational residency requirements, even after the enactment of Chapter 462. Although we recognize that much of this analysis may apply to the other non-durational residency requirements for licensees in Chapter 462 as well, we did not separately analyze each residency requirement in the Alcoholic Beverages Article and therefore do not specifically address whether or not any of them would be upheld under *Thomas*.

> Brian E. Frosh
> Attorney General of Maryland
>
> Kathryn M. Rowe
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

*Thomas S. Chapman, Assistant Attorney General, contributed significantly to the preparation of this opinion.